583 N.W.2d 839 (1998)
1998 SD 105
In the Matter of R.B., T.Y. and K.S., Alleged Abused/Neglected Children.
Nos. 20412, 20470.
Supreme Court of South Dakota.
Considered on Briefs August 21, 1998.
Decided September 9, 1998.
Laurel Olson Eggers, Sioux Falls, for appellant B.B., Mother.
Mark Kadi, Sioux Falls, for appellant, T.S., Father.
Mark W. Barnett, Attorney General, Joan P. Baker, Assistant Attorney General, Pierre, for appellee, State of South Dakota.
PER CURIAM.
[¶ 1.] B.B. (mother) appeals the termination of her parental rights over her three minor daughters: R.B. (age 13); T.Y. (age 8); and, K.S. (age 4). T.S. (father) appeals the termination of his parental rights over K.S. Although mother and father's appeals have been separately filed and briefed, they are consolidated for purposes of this decision. We affirm.

*840 FACTS
[¶ 2.] Mother is a hearing impaired thirty-one year old Native American[1] who resides in Sioux Falls. She has apparently never been married and each of her children has a different father. Mother is a chronic alcoholic and substance abuser who has engaged in a series of relationships with irresponsible, perverse, violent and abusive men. This includes the father of R.B. who was in jail in Eagle Butte the last time the Department of Social Services (DSS) could locate him[2] and the father of T.Y. who was convicted for sexually abusing R.B. and later died in a car accident. T.S., the father of the youngest child, is forty-six years of age and also a Native American. Like mother, he also suffers from chronic alcoholism that continued throughout the dispositional proceedings in this matter.
[¶ 3.] Mother and father's parental rights were terminated in early 1998 after years of domestic violence, neglect and physical and mental abuse of the children. DSS's continual involvement with the family for thirteen years failed to significantly improve the situation and numerous protection orders did nothing to quell the violence in the home.
[¶ 4.] The abuse and neglect petition was filed in March, 1996. Mother and father stipulated to the allegations of abuse and neglect and adjudicatory orders were entered as to both of them. The dispositional hearing commenced in July 1997 and was continued several times until its completion in November. From the adjudicatory proceedings through the initial phases of the dispositional hearing, father was represented by Assistant Minnehaha County Public Defender Hope Matchan. On August 29, 1997, Matchan gave notice to the Public Defender's Office that she would be leaving her employment on September 5. On September 8, Matchan began employment with the Minnehaha County State's Attorney's Office, the agency prosecuting this matter. Mother's counsel subsequently filed motions to dismiss or recuse the State's Attorney's Office because of the alleged conflict of interest created by Matchan's employment.
[¶ 5.] The dispositional hearing was set to reconvene on September 16. Father appeared on that date represented by Assistant Minnehaha County Public Defender Mark Kadi. Mother's motions to dismiss or recuse were heard and denied. However, Kadi moved for a continuance due to his recent assumption of the case and that motion was granted. The dispositional hearing reconvened on October 28 and, after additional continuances, concluded on November 17. The trial court subsequently entered findings of fact, conclusions of law and a dispositional order terminating mother and father's parental rights. Both appeal.

ISSUE
[¶ 6.] Did the trial court err in denying Mother's motions to dismiss or recuse the State's Attorney's Office on the basis of a conflict of interest?
[¶ 7.] Mother contends the trial court erred in denying her motions to dismiss or recuse the State's Attorney's Office. "[Mother] presents an issue of first impression in [South Dakota]: whether an entire [prosecutor's] office is disqualified from prosecuting a case against a defendant when an attorney who previously counseled the defendant in a related matter joins the office." Lux v. Commonwealth, 24 Va.App. 561, 484 S.E.2d 145, 150 (Va.Ct.App.1997).
Courts ... are divided as to whether the presence of a criminal defendant's former counsel in a prosecutor's office automatically precludes the entire office from proceeding against the defendant in a related matter. The majority of jurisdictions do not per se disqualify the entire prosecutor's office solely because one member of the staff had represented the defendant in a related matter. Instead, these jurisdictions permit another prosecutor to handle the case if the defendant's former counsel has been effectively screened from participating in the prosecution.
Lux, 484 S.E.2d at 150-51.[3]
*841 [¶ 8.] In State ex rel. Romley v. Superior Court, 184 Ariz. 223, 908 P.2d 37 (Ariz.Ct. App.1995), the Arizona Court of Appeals reviewed the development of the law in this area and noted that, under ethical rules in effect prior to Arizona's adoption of the Rules of Professional Conduct, "an appearance of evil undermining public confidence was created when a defendant's attorney changed employment and joined the prosecution. The only remedy for this state of affairs was disqualification of the entire prosecutor's office." Romley, 908 P.2d at 40 (citations omitted). However, the Arizona Court went on to note the underpinnings of this rule were removed with the adoption of the Arizona Rules of Professional Conduct. Like Rule 1.11(c)(1) of the South Dakota Rules of Professional Conduct, Rule 1.11 of the Arizona Rules provides:
(c) Except as law may otherwise expressly permit, a lawyer serving as a public officer or employee shall not:
(1) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernment employment[.]
Romley, 908 P.2d at 40. Also like the comment to Rule 1.11 of the South Dakota Rules, the comment to Arizona Rule 1.11 provides in pertinent part, "`[p]aragraph (c) does not disqualify other lawyers in the agency with which the lawyer in question has become associated.'" Id.
[¶ 9.] Based upon this evolution in the rules of ethics, the Arizona Court developed a fact-specific analysis for determining the necessity of a vicarious disqualification of an entire prosecutor's office on its employment of a defendant's attorney. This analysis, like that suggested by Lux, supra, is largely focused on the screening mechanisms utilized in the prosecutor's office to protect against impropriety and inadvertent disclosure of confidential information that would compromise the defendant's interests.
[¶ 10.] The screening mechanisms utilized by the Minnehaha County State's Attorney's Office in this case were extensive and parallel those recommended in Romley, supra:
First, at office meetings with all of his staff, the State's Attorney explained the screening policy that was being put into place to screen Matchan from those cases in which she had been involved as a public defender. At these meetings, the State's Attorney distributed a memorandum to his staff for inclusion in the employee handbook advising that Matchan would not be representing the State in any matter in which she participated as a public defender and that she would have to be screened from participation in any such matter. The memo prohibited all formal or informal conversations and discussions with Matchan about any matter she handled as a public defender and further stated that Matchan was prohibited from participating in any negotiations or court proceedings in matters she handled as a public defender. Attached to the memorandum was a list of Matchan's open files at the time she left the Public Defender's Office.
Second, the State's Attorney directed a letter to each of Matchan's former clients in care of their current public defenders announcing Matchan's employment, outlining the screening policy and advising that any employee in violation of the screening policy would be disciplined.
Third, a copy of the State's Attorney's screening policy was distributed to every Circuit Court Judge and Magistrate in Minnehaha County.
Fourth, a copy of the screening policy was placed in every active file in the State's Attorney's Office in which Matchan had participated as a public defender including a statement that any violation of the screening policy must be reported immediately to the State's Attorney and that any employee in violation of the screening policy would be disciplined.

*842 Fifth, the State's Attorney issued a second memorandum to all staff members outlining the screening policy, advising that violations must be reported immediately to the State's Attorney and further advising that violations would lead to appropriate sanctions and possible disciplinary action. The memo stated in large bold type that it was required reading, directed that it be read immediately and further directed its placement in each staff member's employee handbook. Attached to the memo was a copy of the screening policy statement being placed in the files of those cases in which Matchan had participated as a public defender.
Sixth, a list of all files from which Matchan was to be screened was placed atop the State's Attorney's file cabinets for open files.
[¶ 11.] The screening policies and procedures were implemented by the Minnehaha County State's Attorney prior to the hearing on mother's motion to dismiss or recuse the State's Attorney's Office on September 16, 1997. Thus, both Matchan and the State's Attorney could accurately represent at that hearing that extensive steps had been taken to screen Matchan from participation in the child abuse and neglect proceedings involving mother and father and that Matchan had no discussions with anyone in the State's Attorney's Office about mother's case. There is no evidence or indication in the record whatsoever to the contrary.
[¶ 12.] Based upon the extensive efforts made to screen Matchan from any communication with anyone in the State's Attorney's Office about this case after her employment with that office and the lack of any showing of a violation of the screening policy, we find no error in the trial court's denial of mother's motions to dismiss or recuse.
[¶ 13.] We have also considered mother and father's remaining arguments and find them to be without merit.
[¶ 14.] Affirmed.
[¶ 15.] MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, JJ., participating.
NOTES
[1] The children's Native American heritage invokes the provisions of the Indian Child Welfare Act (ICWA). People In Interest of B.S., 1997 SD 86, ¶ 2, n. 1, 566 N.W.2d 446, 447.
[2] R.B.'s father was served by publication in these abuse and neglect proceedings.
[3] An article in the American Journal of Trial Advocacy refers to Lux as representative of the majority view and cites numerous authorities from various jurisdictions as supporting that point. See Wendy A. Reese, Professional Responsibility Switching Sides: Analyzing Lux v. CommonwealthDoes the Presence of a Criminal Defendant's Former Counsel in a Prosecutor's Office Require Disqualification of the Entire Office?, 21 Am. J. Trial Advoc. 431 (Fall 1997).